[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

———————————————

No. 97-8042

———————————————

D. C. Docket No. 1:96-CV-988-GET

FLOYD ERNEST HILL,

Petitioner-Appellee,
Cross-Appellant,

versus

TONY TURPIN, Warden, Georgia
Diagnostic & Classification Center,

Respondent-Appellant,
Cross-Appellee.

———————————————

Appeals from the United States District Court
for the Northern District of Georgia

———————————————

(February 25, 1998)

Before ANDERSON, CARNES and BARKETT Circuit Judges.

BARKETT, Circuit Judge:

Georgia Warden Tony Turpin ("the state") appeals from the district court's order granting in part Floyd Ernest Hill's petition for federal habeas corpus relief as to his death sentence. Hill cross-appeals from the district court's denial of all of his claims challenging the validity of his conviction, as well as from the denial of the balance of his claims pertaining to his death sentence. Because we find that the prosecution's repeated and deliberate references throughout Hill's trial to his post-<u>Miranda</u> silence and request for counsel violated the Due Process Clause of the Fourteenth

Amendment, we REVERSE the district court's denial of relief as to this claim, VACATE his conviction, and REMAND with instructions to grant the writ of habeas corpus. All remaining issues having thereby become moot, we do not address them.

**BACKGROUND**

On the evening of February 8, 1982, Hill was at home, drinking and listening to music in his car with a friend, Wayne Lockette, when a violent domestic dispute erupted between Hill's neighbors, Virginia Barber and Edward Saffo, who lived together in a trailer behind Hill's residence. In connection with the dispute, Saffo twice fired a .32 caliber pistol outside the trailer and then left the area "to cool off." Barber went back inside the trailer, called the police, and then "set out after Saffo," armed with a pair of scissors. Janice Miller, another neighbor and a friend of Barber's who had been present at the Saffo/Barber residence when the altercation began, approached Hill and asked for his help in breaking up the fight. Hill declined, stating that he was too drunk to intercede.[1] After Miller left, Hill asked his daughter, Anita, to retrieve his gun from the house for protection. When Anita returned she handed Hill a flap-type holster, which, according to Hill, was empty. Lockette, who had exited the car by that time, watched Anita give Hill the holster but could not see whether the holster contained a gun. Lockette then went into the Hill residence with Hill's children.

Meanwhile, Barber caught up to Saffo along the road in front of their residence just as two police officers, Greg Thames and Greg Mullinax, arrived on the scene, responding to Barber's emergency call. Miller, as well as several of Barber's children, were also present when the officers arrived. Officer Thames attempted to subdue Barber; however, as he was placing her in the rear of

---

[1] A blood sample taken after his arrest showed that Hill's blood alcohol level was .21, indicating that Hill was under the influence of alcohol at that time.

the patrol car, Barber's 15-year old son Stanley, armed with a butcher knife, began to fight with Thames. When the officers responded to this new threat, Barber left the patrol car and rejoined the fight. By this time, the confrontation had drawn a number of bystanders, including Daryl Toles, Miller's brother, and Hill, who had driven his car down his driveway to the scene, parked immediately behind the police vehicle, and exited his car. Upon seeing Hill, the only person present whom he recognized, Officer Thames twice requested Hill's help, asking him to get the children out of the way of the fighting.

As Officer Thames was attempting to apprehend Miller, who had joined the confrontation, he heard Mullinax yell "watch out," then one loud shot, then a series of shots that "sounded like a string of firecrackers." Thames did not see who fired any of the shots. Barber, Miller, and two of Barber's children claimed to have seen Hill fire once into the air, but did not see who fired the subsequent shots. Apart from Mullinax and Toles, both of whom had been wounded in the shooting, and Thames, who radioed for help upon seeing Mullinax fall, everyone else at the scene scattered. Mullinax and Toles both died from their gunshot wounds – Mullinax at the scene, and Toles in the hospital. It was later determined that Mullinax had fired the two bullets that struck and killed Toles, and that the bullets that killed Mullinax had been fired from a .38 caliber pistol.

When investigators arrived, they followed a trail of blood leading from the street, to Hill's home, into and out of the Hill residence, back to the Saffo/Barber trailer, and into the woods behind the trailer where they found Hill lying on the ground suffering from several gunshot wounds. The police seized a .32 caliber pistol from Hill, advised him of his rights, and arrested him. Investigators also seized a holster that fit a .38 caliber gun from Hill's car, which had been left at the scene. Later that evening, investigators spoke to many of those who had been present at the shooting, none of

whom identified Hill as Officer Mullinax's assailant. These witnesses also gave conflicting accounts of the events leading up to the shooting. Several days later the .38 caliber pistol from which the shots that killed Mullinax had been fired was found next to a tree between the Hill and Saffo residences.

Hill was subsequently indicted for the malice murder of Officer Mullinax and the felony murder of Toles. Hill was convicted on both counts and was sentenced to death for the murder of Officer Mullinax and to life imprisonment for Toles's murder. On direct appeal, the Georgia Supreme Court affirmed Hill's conviction and death sentence for the murder of Officer Mullinax, but reversed Hill's conviction and life sentence for Toles's murder, finding that Hill had not "caused" Toles's death within the meaning of the Georgia felony murder statute. The U.S. Supreme Court denied Hill's petition for certiorari. Approximately two years later, in 1985, Hill filed an application for a writ of habeas corpus in state court, and in 1992, the state habeas court granted Hill relief from his conviction and death sentence, finding that he had been denied the effective assistance of counsel because of his trial counsel's simultaneous representation of a witness for the prosecution. The Georgia Supreme Court subsequently reversed the grant of habeas relief as to Hill's conflict of interest claim and affirmed the denial of relief on all other grounds.

Hill then filed this petition for federal habeas corpus relief, again challenging the validity of both his conviction and his death sentence on various grounds. After considering Hill's claims, the district court vacated Hill's death sentence, finding that the jury's consideration of Hill's subsequently reversed felony murder conviction impermissibly tainted the sentencing deliberations. However, the district court denied relief as to Hill's remaining claims pertaining to his death sentence and as to all claims pertaining to his conviction. We reverse. We conclude that, under the

facts of this case, the district court erred in denying Hill habeas relief on his claim that the prosecutor's comment on his post-<u>Miranda</u> exercise of his rights to remain silent and to seek the assistance of counsel violated his due process rights under the Fourteenth Amendment.

**DISCUSSION**

In <u>Doyle v. Ohio</u>, 426 U.S. 610, 619 (1976), the Supreme Court held that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving <u>Miranda</u> warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." As the Court has recognized in numerous post-<u>Doyle</u> opinions, the <u>Doyle</u> rule "rests on 'the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial.'" <u>Wainwright v. Greenfield</u>, 474 U.S. 284, 291 (1986) (quoting <u>South Dakota v. Neville</u>, 459 U.S. 553, 565 (1983)). <u>See also</u> <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 628 (1993); <u>Greer v. Miller</u>, 483 U.S. 756, 763 (1987). The source of this "implicit assurance" is the giving of <u>Miranda</u> warnings, through which a person taken into custody is expressly advised "that he has the right to remain silent, . . . and that he has a right to retained or appointed counsel before submitting to interrogation." <u>Doyle</u>, 426 U.S. at 617. Thus, although the improper references at issue in <u>Doyle</u> concerned only the defendants' post-<u>Miranda</u> silence, the prohibition extends equally to impeachment use of a defendant's post-<u>Miranda</u> invocation of the right to counsel. <u>See</u> <u>Wainwright</u>, 474 U.S. at 295 & n.13; <u>United States v.</u>

McDonald, 620 F.2d 559, 562-63 (5th Cir. 1980);[2] United States v. Daoud, 741 F.2d 478, 480 (1st Cir. 1984) (citing McDonald, 620 F.2d at 562-63).

Prior to Hill's trial, in an effort to ensure the prosecution's adherence to the Doyle rule, defense counsel filed a motion in limine, seeking to prohibit the prosecution from introducing "any testimony or evidence as to . . . [a]ny alleged statement by Defendant requesting assistance of Counsel prior to giving any statements to investigating officers." After a hearing, the trial court granted Hill's motion and entered an order specifying that "the prosecution is precluded from attempting to introduce evidence or testimony as to . . . any alleged statement by the accused to the effect that 'I won't say anything until I talk to my lawyer.'" Notwithstanding the trial judge's direct order, on four separate occasions during Hill's trial, the prosecution brought to the jury's attention Hill's post-Miranda silence and request for counsel.

The first two such references occurred during the direct examination of the state's chief investigator, John Seay. When the subject of Seay's testimony turned from the investigation of the crime scene to the circumstances surrounding Hill's arrest, including the content of the Miranda warnings Hill received, defense counsel asked to approach the bench, recognizing that the prosecution's questioning was approaching the subject matter of the court's pre-trial order. Seeking to ensure the prosecution's compliance with the pre-trial order, Hill's counsel reminded both the prosecutor and the court of the order, to which the court responded, "[h]e is not going to say anything about that [Hill] declined to say anything or anything like that, because I've got an order.

_____

[2]In Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981), this court adopted as binding precedent the decisions of the United States Court of Appeals for the Fifth Circuit, as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date.

I issued an order." Despite counsel's reminder and the court's admonition, however, the prosecution continued to question Seay about his post-<u>Miranda</u> exchange with Hill:

> Q:      Now, basically, what type of conversation did you have with him [after advising Hill of his rights]?
>
> A:      Well, naturally I asked him what had happened.
>
> Q:      <u>What was his response?</u>
>
> A:      <u>His response was nil.  He did not give a response.</u>

(emphasis added).  Defense counsel again asked to approach the bench, but, without recognizing counsel's request, the court instead gave the jury a cautionary instruction, advising them that

> [u]nder no circumstances, as I have told you, is a defendant required to say anything at any time.  Under no circumstances does the defendant have any burden of proof whatsoever in a criminal case. [You] understand that, don't you? . . . It is perfectly within any defendant's legal rights and privileges to decline to say anything, and certainly in this instance where he was injured, so I don't want any unfavorable inference to be drawn in any way, form or fashion by virtue of the statement of this witness, that he declined to say anything further.  Do [you] understand that fully?

Notwithstanding the court's instruction, the prosecution again elicited testimony within the scope of the court's pre-trial order with its very next question, asking whether Seay and Hill had shared any further conversation while waiting for the ambulance to arrive.  Seay responded:

> Yes, sir.  I asked him if he was in great pain, and he said yes, his arm hurt, and I told him that the ambulance would be there in a little bit and would take him and get him treated, and he asked me for a cigarette, which I found him a cigarette and gave it to him, and at that time <u>he stated that he wanted his lawyer</u>.

(emphasis added).  Hill's counsel again objected, and the court agreed that counsel would be given an opportunity to perfect the record.

Later that day, outside the presence of the jury, defense counsel moved for a mistrial and contempt hearing.  The court agreed that the prosecution's violations of the pre-trial order might

warrant a contempt hearing, but declined Hill's request for a mistrial, indicating that it would instead attempt to remedy the second violation by giving another curative instruction.[3]  Although Hill's counsel requested that the court delay giving this instruction until the end of the case so as to avoid drawing the jury's attention to Hill's request for counsel, the court elected to address the improper remark upon resuming trial proceedings following the recess.  The court made reference to the earlier curative instruction, then advised the jury:

> Now, it has been called to my attention that there was a further statement made, that when he asked the defendant about what happened, he said he didn't want to make any statement at that time until he talked to his lawyer.  He had a right to make that statement.  You don't have to make any statement at all until you talk to your lawyer.  It is a pretty good idea, to tell you the truth.  That's what I would do, so there is no unfavorable inference to be drawn from that, and I don't think anybody was trying to create an unfavorable inference. . . . I charge you specifically and as clearly as I know how that you shall not in your mind create any unfavorable inference against this defendant at all by virtue of the fact that he said something to the effect that he didn't want to talk about it to the officer until he talked with his lawyer.

Undeterred by the court's pointed evidentiary rulings, the prosecution continued to use Hill's silence to impeach him.  A third reference to Hill's post-arrest silence occurred during Hill's own testimony when, on cross-examination, the prosecutor asked him, "[d]id you ever try to explain all of this to anybody before today?"  The trial court sustained defense counsel's timely objection before Hill had an opportunity to respond and instructed the jury to disregard the prosecutor's question.  Finally, during closing argument, the prosecution again highlighted Hill's failure to tell his exculpatory story to the police at the time of his arrest by contrasting Hill's silence with the

---

[3]After the conclusion of Hill's trial, the court held a hearing to determine whether one of the prosecutors should be held in contempt for eliciting testimony from Seay in violation of the court's pre-trial order.  The court subsequently issued an order holding the prosecutor in contempt on grounds that he had not adequately instructed Seay not to testify about Hill's failure to make a statement and request to talk to his lawyer.

statements made by other scene witnesses. In an effort to discredit Hill's account of events on the

night of the shooting, as well as to bolster the credibility of the state's scene witnesses by

minimizing the significance of any discrepancies between the trial testimony of those witnesses and

their prior statements to the police, the prosecutor argued:

> but when it came down to the defense giving a story, what happened? Who testified
> as an eyewitness? Floyd Hill. Do we ever see any other witness who can tell us
> anything different, anything totally against what the eyewitnesses said, and that is
> what is important when you are talking to eyewitnesses, not that they have a
> conviction for burglary. That may have some effect. Not that they may have told
> prior inconsistent statements, but these people separately and on their own gave a
> statement that was unreputed [sic], except for the defendant.

(emphasis added).[4]

---

[4]We recognize that, standing alone, the prosecutor's remarks during closing argument are
somewhat ambiguous, and that the jury might not, therefore, "naturally and necessarily"
understand those remarks to be a comment on Hill's post-Miranda silence and request for
counsel. See United States v. Dodd, 111 F.3d 867, 869 (11th Cir. 1997). Viewed in the context
of the repeated and clear Doyle violations that occurred earlier in the trial, however, we construe
the excerpted portion of the prosecutor's closing argument as a reminder to the jury of Hill's
failure to give a statement to the police at any time prior to trial.

The district court found – and, with one exception,[5] the state does not dispute – that the prosecution's "repeated references to Hill's post-Miranda request for counsel and assertion of right to silence . . . violated the Doyle standard." However, the district court denied Hill habeas relief on his Doyle claim, concluding that the prosecution's improper references were harmless as they did not "substantially influence" the jury's verdict. While we agree with the district court that the prosecutor repeatedly violated the Doyle rule, we cannot agree with the court's conclusion that these violations amounted to harmless error under the standard articulated by the Supreme Court in Brecht v. Abrahamson, 507 U.S. 619 (1993).

In Brecht, the Supreme Court adopted the harmless error standard previously articulated by the Court in Kotteakos v. United States, 328 U.S. 750 (1946), as the standard for determining whether a conviction must be set aside on collateral review because of Doyle violations or other "constitutional error of the trial type." That standard requires that we assess whether the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht, 507 U.S. at

---

[5]The state contends that the prosecutor's question to Hill on cross-examination as to whether Hill had previously attempted to explain his account of events on the night of the shooting does not constitute a Doyle violation under Greer v. Miller. In Greer, the Supreme Court held that where the prosecution's sole reference to the defendant's post-Miranda silence was his question on cross-examination, "[w]hy didn't you tell this story to anybody when you got arrested?," and where the trial court sustained defense counsel's objection before the defendant could offer a response and then specifically instructed the jury to disregard the question, no Doyle violation had occurred. Greer, 483 U.S. at 759, 764-65. Had the prosecutor's question been the only reference to Hill's exercise of his Miranda rights during the course of Hill's trial, we would agree with the state that, although improper, the question alone would not have violated Doyle under the Supreme Court's holding in Greer. Unlike in Greer, however, the improper question was not the lone but the third of four such references by a prosecutor who had been warned repeatedly by the court, both prior to trial and following each of the two earlier Doyle violations, that this type of comment would be prohibited. Accordingly, we find that Greer is plainly inapplicable in the circumstances of Hill's case.

623 (quoting <u>Kotteakos</u>, 328 U.S. at 776). As Justice Stevens amplified in his concurring opinion,[6] the reviewing court must evaluate the error in the context of the entire trial record, mindful of "all the ways that error can infect the course of a trial," to apply the <u>Kotteakos</u> harmless error standard properly:

> [t]he habeas court cannot ask only whether it thinks the petitioner would have been convicted even if the constitutional error had not taken place. <u>Kotteakos</u> is full of warnings to avoid that result. It requires a reviewing court to decide that "the error did not influence the jury," . . . and that "the judgment was not substantially swayed by the error."

<u>Id.</u> at 642 (Stevens, J., concurring) (quoting <u>Kotteakos</u>, 328 U.S. at 764-65) (footnote omitted). <u>See also</u> <u>O'Neal v. McAninch</u>, 513 U.S. 432, 438 (1995) ("'The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error.'") (quoting <u>Kotteakos</u>, 328 U.S. at 765). Moreover, the Supreme Court's post-<u>Brecht</u> opinions make clear that when the reviewing court "is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless. And, the petitioner must win." <u>Id.</u> at 436.

Having conducted a <u>de novo</u> examination of the trial record, we are persuaded that, in view of the importance of Hill's credibility to his defense, the repeated and deliberate nature of the prosecution's <u>Doyle</u> violations, and the significant weaknesses in the state's case against Hill, the prosecution's references to Hill's post-<u>Miranda</u> silence and request for counsel had a substantial influence in determining the jury's verdict.

Although this court has not previously applied the <u>Brecht</u> harmless error standard in the context of a <u>Doyle</u> violation, other circuits have had occasion to evaluate <u>Doyle</u> error under that

---

[6]Justice Stevens provided the necessary fifth vote in <u>Brecht</u>.

standard. The Sixth Circuit's recent opinion in Gravley v. Mills, 87 F.3d 779 (6th Cir. 1996), is particularly instructive in this regard. As in this case, the Doyle violations at issue in Gravley were repeated. Prior to any testimony from the defendant, the prosecution introduced evidence that the defendant had elected to remain silent during his second round of police interrogation. Id. at 787. On cross-examination, the prosecution again referred to the defendant's post-Miranda silence, questioning him about his failure to offer his version of events in response to police questioning, at the preliminary hearing, or at a subsequent probation revocation hearing. Id. at 787-88. The prosecution then returned to the subject of the defendant's silence in closing argument, reminding the jury that although the defendant had heard the substance of the state's case on several occasions prior to trial, "today . . . is the very first time [the defendant] has ever told you – or told anyone – the truth about what happened." Id. at 788. After concluding that the prosecution's improper references "amounted to blatant and egregious Doyle error," the court proceeded to evaluate the effect of the improper references upon the jury under the Brecht standard. Id. at 789. The court held that the Doyle violations had a substantial influence on the jury "due to the facts of the case and the egregiousness of the prosecutor's misconduct." Id. In reaching this conclusion, the court emphasized the frequency of the prosecutor's improper references, the weight of the state's permissible evidence against the defendant, and the significance of the defendant's credibility to his defense. Id. at 789-90. See also Lieberman v. Washington, 128 F.3d 1085, 1096 (7th Cir. 1997) (finding Doyle error harmless under Brecht upon consideration of similar factors, where the evidence of defendant's guilt was overwhelming, defendant's credibility had already been substantially undermined by physical evidence showing his alibi to be false, and the improper references were limited in intensity and frequency).

Although the harmless error standard has changed, our cases applying the standard articulated in Chapman v. California, 386 U.S. 18 (1967) – whether the error was harmless beyond a reasonable doubt – nevertheless inform and assist us in our analysis under Brecht.  Turning to those cases, we first observe that we have repeatedly held Doyle error harmless where the violation consisted of only a single reference to the defendant's post-Miranda silence during the course of a trial at which the government's evidence was otherwise overwhelming.  See United States v. Gabay, 923 F.2d 1536, 1541 (11th Cir. 1991); United States v. Ruz-Salazar, 764 F.2d 1433, 1437 (11th Cir. 1985); Sullivan v. Alabama, 666 F.2d 478, 485 (11th Cir. 1982).  In so holding, we have often emphasized both that the improper reference was "isolated" or "unintentional" or promptly addressed by a curative instruction from the trial court, and that the prosecutor made no effort to further "highlight" the defendant's exercise of Miranda rights either in questioning other witnesses or during closing argument.  See United States v. Gonzalez, 921 F.2d 1530, 1549-50 (11th Cir. 1991) (finding the prosecutor's single reference to defendant's post-Miranda silence harmless where "[t]he prosecutor did not return to this testimony either while questioning other witnesses or upon closing argument," the state's evidence was "otherwise strong to clearly indicate [the defendant's] involvement," and the improper comment "was quickly objected to and a curative instruction was promptly given to the jury"); United States v. Smith, 635 F.2d 411, 413–14 (5th Cir. Unit B 1981) (finding a single comment on defendant's silence harmless where the prosecutor "did not 'focus on' or 'highlight' the defendant's silence in his examination of the witnesses or in his closing remarks," the court immediately gave a curative instruction, and the evidence of guilt was otherwise overwhelming); United States v. Espinosa-Cerpa, 630 F.2d 328, 335 (5th Cir. 1980) (finding improper references to defendant's silence by a government witness harmless in light of the low

probability of prejudice given that the "statements were isolated and unsolicited, never 'highlighted' by repeated questioning or subsequent reference by the prosecutor," the court's curative instruction, and the otherwise overwhelming evidence of the defendant's guilt).

In contrast, we have declined to find <u>Doyle</u> error harmless in those cases where the prosecutor returned repeatedly to the defendant's post-<u>Miranda</u> silence throughout trial to impeach a plausible exculpatory story offered by the defendant. <u>See</u> <u>United States v. Tenorio</u>, 69 F.3d 1103, 1106-07 (11th Cir. 1995) (<u>Doyle</u> error not harmless beyond a reasonable doubt where the prosecution's references to the defendant's post-<u>Miranda</u> silence occurred during direct examination of a government witness, during cross-examination of the defendant, and in closing argument); <u>Matire v. Wainwright</u>, 811 F.2d 1430, 1436-37 (11th Cir. 1987) (<u>Doyle</u> error not harmless where the prosecutor repeatedly elicited testimony highlighting the defendant's silence and utilized that testimony to defeat his insanity defense, and where "the evidence of [defendant's] sanity was far from overwhelming"); <u>United States v. Meneses-Davila</u>, 580 F.2d 888, 891, 895-96 (5th Cir. 1978) (prosecution's "four separate, intentional references to defendant's post-arrest silence" not harmless where "[d]efendant's [exculpatory] story is not totally implausible and the indicia of guilt is not overwhelming"). Moreover, this court has recognized that even a single improper reference might not be harmless under the <u>Chapman</u> standard where the defendant's exculpatory story – on which the prosecution's comment cast doubt – was not implausible, the government's evidence was not overwhelming, and the reference was purposeful. <u>See</u> <u>United States v. Shavers</u>, 615 F.2d 266, 269-70 (5th Cir. 1980); <u>United States v. Impson</u>, 531 F.2d 274, 277-79 (5th Cir. 1976).

As the primary witness in his own defense, Hill maintained that he had been unarmed at the scene of the shootings. Although several of the state's witnesses had earlier testified to having seen

Hill with a gun that night, defense counsel had significantly undermined the credibility of all of the state's adult scene witnesses with evidence that they had previously given statements significantly inconsistent with their trial testimony, that they had been involved in the underlying altercation, or that they had been under the influence of alcohol and/or marijuana.[7] In light of the doubt cast on the account offered by the various scene witnesses, Hill's credibility was particularly important to his defense. Recognizing that any reference by the prosecution to Hill's silence and request for counsel at the time of his arrest would be highly damaging to Hill's credibility, defense counsel went to great lengths to prevent all such comment. Counsel not only obtained a pre-trial order barring all reference to any statement by Hill to the effect that "I won't say anything until I talk to my lawyer," but also attempted to ensure the prosecution's compliance with the court's order, reminding the prosecution of the order when the testimony of a state witness began to approach the prohibited topic, timely objecting to each of the prosecution's improper references, and moving for a mistrial at the earliest opportunity.

Despite defense counsel's efforts, the prosecution repeatedly referred to Hill's post-<u>Miranda</u> silence and request for counsel throughout Hill's trial, in blatant disregard of the court's pre-trial order and subsequent evidentiary rulings. Moreover, the prosecution's improper references were not confined to a single witness. Rather, counsel twice elicited testimony in violation of the pre-trial order from Seay, again commented on Hill's failure to offer his account of the circumstances of the shootings at any time prior to trial during Hill's cross-examination, and then returned to the subject of Hill's post-<u>Miranda</u> silence during closing argument. With each of these references, the

---

[7]The state's remaining scene witnesses were Barber's minor children whose testimony came largely in response to leading questions.

prosecution encouraged the jury to infer the falsity of Hill's exculpatory story from his exercise of Miranda rights at the time of his arrest, precisely the inference that Doyle seeks to prohibit.

Nor can we say that the trial court's valiant and well-intentioned attempt to remedy the Doyle error through curative instructions eliminated the taint created by the prosecutor. Significantly, the most substantial of the trial court's instructions may have served not to cure but to magnify the impact of the prosecution's improper comment. Although defense counsel promptly objected to Seay's statement that, while waiting with Hill for an ambulance following Hill's arrest, Hill had "stated that he wanted his lawyer," the court did not give a curative instruction at that time. Rather, direct examination of Seay continued, the questioning shifting to Seay's investigation of the crime scene after Hill was taken to the hospital, until the court recessed for lunch. It was not until after that recess that the court gave a curative instruction, thus requiring the court to remind the jury of Hill's post-arrest silence and request for counsel yet another time and causing further prejudice to Hill. The court prefaced its remarks with a reference to the curative instruction it had previously given in response to Seay's comment that Hill had elected to remain silent upon being advised of his Miranda rights, then proceeded to mischaracterize the objectionable portion of Seay's testimony to Hill's detriment. Although Seay had testified that Hill had simply "stated that he wanted his lawyer," the court offered the following summary of Seay's comment: "[n]ow it has been called to my attention that there was a further statement made, that when he asked the defendant about what happened, he said he didn't want to make any statement at that time until he talked to his lawyer." In these circumstances, we are not persuaded that the trial court's instructions sufficiently remedied the prosecution's misconduct. See Impson, 531 F.2d at 276 (viewing the trial court's curative instructions as of "no controlling significance" where those instructions may have "aggravated the

-16-

harmful effect of the prosecution's error"); <u>United States v. Kallin</u>, 50 F.3d 689, 694-95 (9th Cir. 1995) (finding that the jury could not possibly be expected to disregard the prosecutor's extensive comment, on cross-examination and in closing argument, about the defendant's post-arrest silence and retention of counsel where the trial court's curative instruction "was not contemporaneous with the [<u>Doyle</u>] error," requiring the judge to "reiterate[] the impermissible content of the testimony, again calling attention to defendant's silence). Moreover, for all of the reasons discussed above, we cannot say that the jury's verdict was not substantially influenced by the prosecution's <u>Doyle</u> violations.

REVERSED and REMANDED for further proceedings consistent with this opinion.