PAUL A. BONIN, Judge.
| Daniel Marshall appeals his manslaughter conviction for the killing of Ronald Hodges, Jr.
Between him and his appellate counsel he assigns five errors. Because we conclude that the error they assigned about the trial judge’s denial of his motion for mistrial based upon the prosecutor’s cross-examination of him about his post-custody silence requires reversal of his conviction, we do not address the remaining assignments in the body of our opinion.[1] At the trial, the prosecutor, over defense objection, cross-examined Mr. Marshall about invoking his right to remain silent rather than inform the arresting officers about his claim of self-defense. Moreover, the prosecutor chose to elaborate even further upon Mr. Marshall’s silence during her closing arguments. Following our review of the ^evidence and verdict rendered, we cannot declare a belief beyond a reasonable doubt that the complained-of constitutional error did not contribute to the verdict. We, thus, find that the error is not harmless and, accordingly, find that Mr. Marshall is entitled to a new trial. We explain our decision in greater detail in the following Parts.
I
We begin our discussion by recalling the right, guaranteed to Mr. Marshall by both the federal and state constitutions, against compulsory self-incrimination. See U.S. Const. Amend. V (“No person ... shall be compelled in any criminal case to be a witness against himself’); La. Const, art. I, § 16 (“No person shall be compelled to give evidence against himself.”)
In order to protect this important right, the United States Supreme Court holds that “the prosecution may not use statements, whether exculpatory or incul-patory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.” Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). “At the outset,” the Court ruled, “if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent.” Id., at 467-468, 86 S.Ct. 1602. And “[t]he warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court.” Id., at 469, 86 S.Ct. 1602. The Court continued that “[t]his warning is needed in order to make him aware of the privilege, but also of |sthe consequences of foregoing it.” Id. And, importantly, “[o]nce warnings have been given, the subsequent procedure is clear. If the individual indicates in any *926 manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.” Id., at 473-474, 86 S.Ct. 1602.
The use of a defendant’s post-Miranda silence is commonly referred to as a Doyle violation. See, e.g., State v. Pierce, 11-320, pp. 6-7 (La.App. 5 Cir. 12/29/11), 80 So.3d 1267, 1272. More than thirty-five years ago, the United States Supreme Court decided that “it would be fundamentally unfair and a deprivation of due process to allow the arrested person’s silence to be used to impeach an explanation subsequently offered at trial.” Doyle v. Ohio, 426 U.S. 610, 618, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). In doing so, the Court explicitly rejected the prosecution’s argument that it ought to be able to cross-examine a defendant to impeach him because “the discrepancy between an exculpatory story at trial and silence at time of arrest gives rise to an inference that the story was fabricated somewhere along the way.” Id., at 616, 96 S.Ct. 2240. The Court explained that “[s]ilence in the wake of these warnings may be nothing more than the arrestee’s exercise of these Miranda rights ... [t]hus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested.” Id., at 617, 96 S.Ct. 2240. The Court also held “that the use for impeachment purposes of [a defendant’s] silence, at the time of arrest and after receiving Miranda warnings, vio-latefs] the Due Process Clause of the Fourteenth Amendment.” Id., at 618, 96 S.Ct. 2240. See also Wainwright v. Greenfield, 474 U.S. 284, 291, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986), quoting South Dakota v. Neville, 459 U.S. 553, 565, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983). Recently, the United States Supreme Court reaffirmed its ruling that post-Miranda silence in itself is invocation of the right and “pointing to the fact that a defendant was silent after he heard Miranda warnings” violates due process. Salinas v. Texas, 570 U.S. -, n. 3, 133 S.Ct. 2174, n. 3, 186 L.Ed.2d 376 (2013); see also Jenkins v. Anderson, 447 U.S. 231, 240, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980).
Therefore, in order for trial error to rise to the level of an unconstitutional Doyle violation, and thereby trigger the harmless-error test, the error must concern post-Miranda silence. See, e.g., State v. Patterson, 12-0464 (La.7/2/12), 92 So.3d 338; State v. Arvie, 505 So.2d 44, 47 (La.1987); State v. Sam, 412 So.2d 1082, 1085 (La.1982); State v. Montoya, 340 So.2d 557 (La.1976) (trial court erred in allowing arresting officer to testify that defendant remained silent after arrest). If the alleged error merely concerns pre-Miranda conduct, there is no Doyle violation.[2] See State v. Richards, 99-0067, p. 2 (La.9/17/99), 750 So.2d 940, 941 (although there was a warrant there was no custodial arrest or Miranda given; thus, the defendant’s pr e-Miranda silence could be used at trial); State v. Smith, 11-0664, pp. 19-21 (La.App. 4 Cir. 1/30/13), 108 So.3d 376, 388-89.
In this case, however, not only did Mr. Marshall invoke his right to remain silent, that fact was elicited from him by the prosecutor:
Q. You never talked to the detectives on the 29th?
A. No, ma’am.
Q. In fact you invoked your right to remain silent?
[¡A- Yes, ma’am.
*927 Q. And you haven’t talked to anybody for the past two years and told them it was self-defense, correct?
The court in Doyle reasoned that Miranda implies assurance to the defendant that their silence will not be used against them. Doyle, supra, at 617-18, 96 S.Ct. 2240. Not every reference to post-Miranda silence shall constitute a Doyle violation requiring reversal — there are exceptions which allow reference to a defendant’s post -Miranda silence. See, e.g., State v. Bell, 446 So.2d 1191, 1194 (La.1984) (no violation when the state refutes the defense accusation that the state failed to thoroughly investigate and clear the defendant); State v. Kersey, 406 So.2d 555, 559-560 (La.1981) (no violation when clarifying statements willingly made to officers post-Miranda); State v. Mosley, 390 So.2d 1302, 1305-1306 (La.1980) (no violation where “oblique and obscure” references in no way prejudice the jury); State v. Joseph, 10-1090, pp. 13-14 (La.App. 4 Cir. 8/12/11), 71 So.3d 549, 556 (no violation when trial judge immediately sustained defense objection to a single reference of post-arrest silence, admonished the jury, evidence of guilt was overwhelming, and there was no plausible defense); State v. Bradford, 02-1452, p. 12 (La.App. 4 Cir. 4/23/03), 846 So.2d 880, 888-889 (no violation where there is no attempt to exploit defendant’s silence, the reference was inadvertent and slight, and the alleged error was not preserved for review).
Thus, we emphasize that an indispensable aspect of a Doyle violation is that the defendant has not only actually invoked the protection afforded by the Miranda warning (in this case the right to remain silent), but that the prosecution uses that [ ¡Invocation to impermissibly impeach or call attention to the defendant’s invocation of the right to remain silent. See Greer v. Miller, 483 U.S. 756, 763, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987). See also Richards, supra at 941; State v. Smith, supra at 388-89.
 In its brief, the State concedes— and we agree — that the trial prosecutor’s cross-examination of Mr. Marshall constitutes a Doyle violation. It is clear that the prosecutor’s motive in calling the jury’s attention to Mr. Marshall’s post-Miranda silence was to suggest that Mr. Marshall’s claim of self-defense — raised for the first time during the trial — was a recent fabrication and unworthy of any belief. See, e.g., Doyle, supra at 613, 96 S.Ct. 2240; Wainwright, supra; United States v. Hale, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975); State v. Arvie, supra. “Not only is evidence of silence at the time of arrest generally not very probative of a defendant’s credibility, but it also has a significant potential for prejudice.” Hale, 422 U.S. at 180, 95 S.Ct. 2133. Such pros-ecutorial misconduct — as seen in this case — is likely to prejudice the jury by lending more weight than is proper to the defendant’s silence and bolster other prosecution evidence. See Hale, supra, at 180, 95 S.Ct. 2133; United States v. Impson, 531 F.2d 274, 278 (5th Cir.1976).
A prosecutor simply may not use post-Miranda silence to cast doubt on a defendant’s exculpatory defense introduced at trial. State v. Arvie, supra at 46; see State v. Patterson, supra. “To impeach him by casting doubt on his defense, using his constitutional right to silence to establish an inference that the defense was fabricated, constitutes reversible error.” State v. Sam, supra at 1085.
JiH
Having found a trial error of constitutional magnitude, we turn to consider *928 whether, as the prosecution argues, the error is harmless. See Lockhart v. Fretwell, 506 U.S. 364, 369 n. 2, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (“Harmless error analysis is triggered only after the reviewing court discovers that an error has been committed.” (emphasis in original)). To be precise, the error which we review is not per se the improper conduct by the prosecutor, but the failure of the trial judge to sustain the defendant’s objections to the impermissible use of the defendant’s post-cautioning silence. See Doyle, supra, at 615, n. 5, 96 S.Ct. 2240 (trial court permitted cross-examination to continue over objection); Greer, supra, at 764, 107 S.Ct. 3102 (“the trial court in this case did not permit the inquiry that Doyle forbids. Instead, the court explicitly sustained an objection to the only question that touched upon Miller’s postarrest silence.”)
A trial error, which is an “error which occurred during the presentation of the ease to the jury,” may “be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt.” Arizona v. Fulminante, 499 U.S. 279, 308-309, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (emphasis added). Some constitutional trial errors “which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless ... [and do not require an] automatic reversal of the conviction.” Chapman v. California, 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[3]
|sIn Chapman the prosecutor commented upon the failure of the defendants to testify at their trial. Id., at 19, 87 S.Ct. 824. In expressing a harmless-error rule for evaluating constitutional errors, the Court first approved of the approach it took in Fahy v. Connecticut, where they said: “The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.” Fahy v. Connecticut, 375 U.S. 85, 86-87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963) (emphasis added). See also Chapman v. California, supra at 23, 87 S.Ct. 824. The Court then emphasized that “[c]ertainly error, constitutional error, in illegally admitting highly prejudicial evidence or comments, casts on someone other than the person prejudiced by it a burden to show that it was harmless.” Id., at 24, 87 S.Ct. 824 (emphasis added). The Court at the same time noted that the original common law harmless-error rule “put the burden on the beneficiary of the error either to prove there was no injury or to suffer a reversal of his erroneously obtained judgment.” Id. From these sources, the Chapman court announced and held: “before a federal constitutional error can be held harmless, the [reviewing] court must be able to declare a belief that it was harmless beyond a reasonable doubt.” Id. (emphasis added).
“Consistent with the jury-trial guarantee, the question [Chapman] instructs the reviewing court to consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand.” Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). “The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether |9the *929 guilty verdict actually rendered in this trial was surely unattributable to the error.” Id. (emphasis in original). As the Sullivan court explained, “[t]hat must be so, because to hypothesize a guilty verdict that was never in fact rendered — no matter how inescapable the findings to support that verdict might be — would violate the jury-trial guarantee.” Id. (emphasis added). Thus we, as a reviewing court, do not pretend that the constitutional error did not occur and then evaluate how overwhelming the evidence would have been to a hypothetical jury, or even to the jury charged with fairly deciding this case. We do not hypothetically extract the error from the trial which the jury heard; we must, however, consider and weigh the effect of the error on the actual jury.
After evaluating the effect of the error in this case, if we find “[ujnder these circumstances” that it is completely impossible for us to say the prosecution has demonstrated, beyond a reasonable doubt, that the trial prosecutor’s questioning and comments, and the trial judge’s error, did not contribute to Mr. Marshall’s conviction, then we cannot find the error harmless. See Chapman v. California, supra at 26, 87 S.Ct. 824. And if the error is not harmless, then Mr. Marshall is entitled “to a trial free from the pressure of unconstitutional inferences.” Id. But if we can find beyond a reasonable doubt that this jury’s verdict is surely unattributable to the constitutional error, then the error is harmless and the trial was fair. See State v. George, 95-0110 (La.10/16/95), 661 So.2d 975, 979-80; Mosley, supra; Joseph, supra; Bradford, supra.
JifiHI
In order to evaluate the effect that this error may have had on this jury’s less-than-unanimous verdict, we must consider the plausibility of Mr. Marshall’s defense. See Doyle, supra at 613, 96 S.Ct. 2240 (“[petitioners’ explanation of the events presented some difficulty for the prosecution, as it was not entirely implausible”); Jenkins, supra at 248, 100 S.Ct. 2124; Chapman v. United States, 547 F.2d 1240, 1249-1250 (5th Cir.1977) (setting up a three category analysis regarding the constitutionality of a prosecutor’s conduct in attacking the plausibility of the defense); United States v. Garcia-Flores, 246 F.3d 451, 456 (5th Cir.2001) (applying the Chapman analysis); Hill v. Turpin, 135 F.3d 1411, 1418 (11th Cir.1998); Patterson, supra; Arvie, supra at 46; Sam, supra at 1085.
We now examine the facts adduced at trial, with special emphasis placed on the plausibility of Mr. Marshall’s defense.
We note, initially, that Mr. Marshall admits to killing Mr. Hodges on September 25, 2009, but argues that the shooting was justified because of self-defense. See La. R.S. 14:20 A(l). The prosecution bears the burden of proving beyond a reasonable doubt that Mr. Marshall’s killing of Mr. Hodges was not justified — that Mr. Marshall did not act in self-defense. See State v. Taylor, 03-1834, p. 7 (La.5/24/05), 875 So.2d 58, 63; State v. Lynch, 436 So.2d 567, 569 (La.1983).
Although Mr. Marshall was acquitted of the original charge of second-degree murder, his self-defense claim was rejected by the non-unanimous jury and |nhe was found guilty of the lesser included offense of manslaughter. See La.C.Cr.P. Art. 598.
At trial, the prosecution presented two eyewitnesses to the shooting, Ebony Gasti-nell and her mother Sandra Gastinell, who was living with Ebony at the time of the shooting. The testimony revealed that Mr. Hodges, the victim, had been in a romantic relationship with Ebony Gastinell for several years. Also, Mr. Hodges and *930 Ebony Gastinell had three children together. Mr. Hodges was incarcerated for six months on drug related charges and was released in September 2009. During the time of Mr. Hodges’ incarceration, Ebony Gastinell began her relationship with the defendant, Mr. Marshall. The evidence showed that Mr. Marshall frequented a neighboring house and sometimes stayed at the Gastinell residence. Ebony Gasti-nell testified to knowing that Mr. Marshall usually carried a gun.
Ebony Gastinell testified that after Mr. Hodges was released from jail she lied to him when he confronted her about his relationship with Mr. Marshall. It was Mr. Hodges’ children who told him about their mother’s relationship with Mr. Marshall. At trial, Ebony testified that she and Mr. Marshall “stopped talking” the week that Mr. Hodges was released from jail.
Initially, Ebony testified that she had no knowledge that Mr. Hodges and Mr. Marshall had met prior to the shooting. Mr. Marshall sought to impeach this testimony, however, by pointing out during cross examination that it conflicted with her previous grand jury testimony. Ebony had testified before the grand jury that Mr. Hodges began looking for Mr. Marshall after he learned of the affair and |12had confronted people in the neighborhood, possibly even Mr. Marshall himself. Specifically, Ebony testified before the grand jury that Mr. Hodges, prior to the shooting threatened and unaware of the presence of Mr. Marshall as he was speaking to people on a neighbor’s porch, asked them, “Do y’all know where [Mr. Marshall] is? Where that nigger at? Tell Terrell I’m looking for him.”
Ebony testified that Mr. Hodges came over to her house on the day of the shooting. Later that evening, Mr. Marshall knocked on the door. Ebony went outside to speak to Mr. Marshall in order to tell him that she was trying to mend her relationship with Mr. Hodges. While Ebony and Mr. Marshall spoke, however, Mr. Hodges attempted to come outside as well. Ebony unsuccessfully sought to restrain Mr. Hodges, who exited the residence and jumped off the porch with his hands in the air in the direction of Mr. Marshall. The evidence showed that Mr. Hodges was 6'2" and was over two hundred pounds; Mr. Marshall is 5'6" and about one hundred and forty pounds. It was at this point that Mr. Marshall shot Mr. Hodges.
Forensic evidence and expert testimony given at trial reveal that Mr. Hodges was shot five times and that some shots were likely fired while Mr. Hodges was up against a hard surface, such as the ground, as the prosecution argued at trial. Blood tests revealed that Mr. Hodges had a blood alcohol level of .074, a level of inebriation would make, as described by the coroner, Mr. Hodges “euphoric.” Both Gastinells testified that Mr. Hodges had been drinking in their house prior to the shooting but that he did not drink much.
11sThe foregoing facts were largely undisputed by Mr. Marshall at the trial with two notable exceptions. First, Mr. Marshall contended that he and Ebony Gastinell never broke up. Second, Mr. Marshall testified that Mr. Hodges had a revolver, which belonged to Sandra Gasti-nell, in his hand when he jumped from the porch. Sandra, who had been on parole for armed robbery, and Ebony both deny that there was any such weapon in the Gastinell residence or in Mr. Hodges’ hand at the time of the shooting. No weapons were recovered in the investigation, but Mr. Marshall admitted to being a felon in possession of a firearm and testified that he disposed of the weapon after fleeing the scene.
*931 Mr. Marshall did not tell the investigating police about his self-defense claim, electing instead to remain silent. During cross-examination, the prosecutor called direct attention to Mr. Marshall’s post-arrest silence, questioning why his claim of self-defense had not been offered prior to the trial:
PROSECUTOR: All right. So you turn yourself in ... At that point did you go to the detective and say, wait, let me tell you what happened—
DEFENSE: Objection, Your Honor.
PROSECUTOR: this was a misunderstanding ... ?
DEFENSE: Objection, Your Hon- or....
COURT: Overruled.
PROSECUTOR: did you tell them then ... Did you tell them what happened, Mr. Marshall?
A. No, ma’am.
PROSECUTOR: You never talked to the detectives on the 29th?
|14A. No, ma’am
[[Image here]]
PROSECUTOR: And you haven’t talked to anybody for the past two years and told them it was self-defense, correct?
DEFENSE: Objection, objection, Your Honor. He is telling the jury today. During the closing remarks to the jury, the prosecution again called direct attention to Mr. Marshall’s silence in attacking his defense:
PROSECUTOR: Then what else does he say that also doesn’t support their self-defense theory ... Turns himself in, he had four days to cool down, but still doesn’t want to talk to the detectives. He still doesn’t want—
DEFENSE: I am going to object to that, Your Honor.
PROSECUTOR: — to tell them that he didn’t do this.
COURT: Objection noted.
PROSECUTOR: Never talks to the detectives, never tells anyone this is self-defense until you heard it on the stand, ladies and gentlemen.
DEFENSE: And, Judge, again we object and move for a mistrial.
Without even considering Mr. Marshall’s contention that Mr. Hodges was armed, a review of the facts makes Mr. Marshall’s self-defense claim at least plausible. The defense established through the prosecution’s eyewitnesses that Mr. Hodges sought out Mr. Marshall, on at least two separate occasions, after Mr. Hodges was released from jail and had discovered the affair. The defense also established that Sandra Gastinell did not like Mr. Marshall and put Ebony’s credibility in question with regard to her conflicting trial and grand jury testimonies that Mr. Hodges had sought out Mr. Marshall.
11sIt is clear that on the day of the shooting that the Gastinells knew Mr. Marshall was in the area before they called Mr. Hodges over to their residence. The evidence showed that the Gastinells also knew that Mr. Marshall usually carried a gun. It is also undisputed that attempts were made to restrain the much larger Mr. Hodges from exiting the house and that he jumped off the porch in the direction of the smaller Mr. Marshall. These facts taken together make Mr. Marshall’s self-defense claim plausible.
Because the prosecution’s conduct resulted in a violation of Mr. Marshall’s constitutional rights under Doyle and Miranda, and his exculpatory claim of self-defense was plausible from the facts in the record, we cannot find that the trial error harmless or, stated another way, that the *932 verdict is surely unattributable to the error.
CONCLUSION
The prosecutor’s cross-examination of Mr. Marshall’s -post-Miranda invocation of his right to silence and its suggestion in closing argument, over defense objection and request for a mistrial, that Mr. Marshall’s claim of self-defense was unworthy of belief on that account, is a constitutional trial error. Because Mr. Marshall’s claim of self-defense was plausible, although dependent upon the credibility of Mr. Marshall which was undermined by the prosecutor’s improper examination and argument, we cannot find beyond a reasonable doubt that this jury’s verdict was surely unattributable to the error. Thus, we conclude |1fithat the error was not harmless. Mr. Marshall is accordingly entitled to a new trial free from the pressure of unconstitutional inferences.
DECREE
The manslaughter conviction of Daniel Marshall in the killing of feonald Hodges, Jr., is reversed and his sentence is vacated. The matter is remanded to the district court for further proceedings consistent with this opinion.
REVERSED AND REMANDED
DYSART, J., dissents, with reasons.

. The assignments of error which we preter-mit are (1) that the trial judge abused his discretion in denying a continuance requested by the defense because of the last-hour delivery of material which Mr. Marshall characterizes as exculpatory or Brady, (2) the ruling admitting without objection his tape-recorded conversation, (3) that his trial counsel’s assistance was ineffective by constitutional standards because of the failure of his counsel to contemporaneously object to the admission of the recorded conversation. His remaining assignment of error is his explicit request that we review for errors patent; we always review a criminal appeal for errors patent, and we dispose of this final assignment at this point because we have detected none in this case. See La.C.Cr.P. art. 920(2).

. We find that the prosecutor’s question posed earlier on re-direct to one of the investigating officers, taken alone, does not constitute a Doyle violation because questioning ceased and the potential for prejudicing the jury was slight at best.

. Since the decision in Chapman, the United States Supreme Court has recognized that most constitutional trial errors are subject to assessment under harmless-error analysis. See Arizona v. Fulminante, 499 U.S., at 306, 111 S.Ct. 1246.