McCALEB, Justice.
 

 Appellant was indicted for the murder of Mrs. Rucell Perritt Millien whom he shot fatally with a pistol at her residence in Shreveport, Louisiana on June 23, 1966. After trial by jury, appellant was found guilty of manslaughter and was subsequently sentenced under a hill of information as a second felony offender to serve thirty years in the state penitentiary. On this appeal reliance is had on five bills of exceptions timely reserved during proceedings below for a reversal of appellant’s conviction.
 
 [1]
 

 
 *401
 
 Since the first three bills were taken at the time the State was laying the foundation, out of the presence of the jury, for the admission of certain inculpatory statements given by appellant to the investigating officers, it is apt to state the salient facts pertaining to the shooting of Mrs. Millien so that the legal issues raised in these bills may be more readily understood.
 

 Appellant and Mrs. Millien were intimate friends and they planned to be married. On the night of the killing, appellant was visiting in the apartment where Mrs. Millien was living with her eight-year old daughter, who was asleep in another room when the fatal shots were fired. Sometime after supper the parties became involved in an argument which continued on until shortly after midnight when appellant shot Mrs. Millien five times with a 22 caliber double-action revolver. This weapon belonged to Mrs. Millien and was kept in her bedroom. One shot hit her in the right side and three struck her in the back. Another shot, before penetrating her body, passed through the finger and thumb of her left hand. At about 12 :30 A.M. appellant phoned the police and reported that Mrs. Millien had committed suicide. The call was answered by four police officers and three detectives, who arrived at the residence promptly and found the deceased lying on her back on the bed. Appellant, who admittedly was the only eyewitness to the shooting, first told the officers that the deceased shot herself with a pistol which he pointed out to the officers. After talking to him for a moment, Detective Aymon, who was apparently in charge of the investigation, went to another room to talk with the eight-year old child of the de-, ceased who had a picture of her mother containing an inscription on the back, “We was playing.” The child told the detective she heard appellant and her mother arguing. Detective Aymon then took the picture and went into the other room to further interview appellant. Upon being questioned about the picture, appellant initially stated that the deceased wrote the inscription on the back. Whereupon, appellant was requested to write these same words on a piece of paper, and he complied without objection. Immediately thereafter appellant changed his story about the picture and admitted he had written the phrase, “We was playing”, and he explained that the deceased was supposed to sign it but she only made some marks underneath the inscription.
 

 Five of the officers, who were present at the apartment, testified that appellant was informed of his rights at the scene of the crime. Further, it was shown that wanings were given immediately upon his arrest, i.e., when Detective Aymon placed
 
 *403
 
 handcuffs on him in the kitchen of the apartment and took him to the police station. This occurred shortly after the coroner arrived at the scene. For, when the coroner turned over the body of the deceased and saw three bullet wounds on her back, all present realized that this was a homicide and not a suicide.
 

 In laying the predicate for the admission in evidence of the inculpatory statements given by appellant, the officers taking part in the investigation and subsequent arrest were called to the stand out of the presence of the jury. It was during the recital of the facts, which preceded the giving of these statements, that defense counsel reserved three bills of exceptions, two of which were founded on the alleged failure of the investigating officers to fully comply with the guidelines set forth for police in-custodial • interrogation of accused persons in the 1966 decision of the United States Supreme Court in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.
 

 The other bill, which is Bill of Exceptions No. 1, was reserved to the asserted erroneous action of the court in unduly restricting counsel in his cross-examination of one of the investigating officers, Roger Bryant, when testifying for the State in laying the predicate for the admission of the inculpatory statements. Officer Bryant, after stating that he was one of the Shreveport police officers who was summoned to the Millien apartment in response to a radio call, declared that, as a patrol officer, his duty in death cases is to see that the premises are secure for the preservation of any evidence and to keep sightseers and onlookers out; that when the detectives arrive they take over the investigation; that Detective Aymon took charge of the investigation upon arrival at the scene; and that he heard Detective Aymon inform appellant of his constitutional rights before taking him in custody. However, on cross-examination he stated that appellant was first advised of his rights at the time Detective Aymon placed handcuffs on him, which was about fifteen minutes before he was taken to the station, and he also testified that appellant was questioned prior to this time. Later, on further questioning by defense counsel, he gave the following testimony:
 

 “Q. The defendant was given no warning as to any possible rights he might have prior to being placed under arrest. Is that right ?
 

 A. Yes, sir. He was given his warning; yes, sir.
 

 Q. At the time he was placed under arrest?
 

 A. Yes, sir.
 

 Q. Just before he was taken to the station ?
 

 A. No, sir; before he was being questioned.
 

 
 *405
 
 Q. You stated a minute ago, did you not, Officer Bryant, that he was questioned before he was placed under arrest?
 

 A. Yes, sir I did.
 

 Q. And before he was given any warning?
 

 A. No, sir, I didn’t.
 

 Q. I would like to ask the reporter to read back Officer Bryant’s testimony.
 

 THE COURT: No. If you have questions you want to ask keep on asking.
 

 Mr. Spencer: Is my request being refused ?
 

 THE COURT: Yes.
 

 Mr. Spencer: I reserve a bill.
 

 THE COURT: It is noted.”
 

 The appointed counsel argue in' this Court that it was reversible error for the judge to virtually deny appellant’s lawyer the right to impeach the credibility of Officer Bryant by having the stenographer read back to him his prior statement, given under cross-examination, that appellant had not been advised of his rights until Detective Aymon took him in custody by placing handcuffs on him.
 

 We do not so view the ruling of the judge. Actually, as quoted above, the judge stated that he would not permit the reporter to read back the officer’s prior testimony. However, the judge added:
 

 “If you have questions you want to ask keep on asking.” The examination of the witness was before the judge, and he was well aware that the officer had made a statement on cross-examination which he later denied to be correct. Counsel could have easily cleared this contradiction by asking the officer whether the testimony he had just previously given before his last an-swer was correct or whether he wished to. specifically recant his previous answer anent the time when the first warning was given to appellant by Detective Aymon.
 

 R.S. 15:493, prescribing the proper method for laying the foundation for proof of a contradictory statement of a witness, declares that the witness must first be-asked whether he did make such a statement and, if he denies making it (as shown herein), then evidence that he did make it is admissible. But the failure of the judge to strictly comply with the terms of this article does not justify a reversal in all cases, particularly when it is shown that the judge did not curtail counsel’s cross-examination. For, here, the judge told counsel that he could continue to examine the witness and, as a matter of fact, counsel did examine the witness and obtain all the information he desired. A reading of the entire testimony given by Officer Bryant convinces us that he was not present at all times during the questioning of appellant by the detectives, and that he did not have full knowledge as to when various warn
 
 *407
 
 ings avouched by those officers were given.
 

 At all events, even though the ruling of the judge may not be technically correct, it was harmless error and does not constitute a sound basis for the granting of a new trial. See Article 921 Code of Criminal Procedure.
 

 Bill of Exceptions No. 2 was reserved to the introduction in evidence of two disc-recorded inculpatory statements of appellant, given at the police station shortly after his arrest, and two written transcriptions thereof. Attached to this bill is the testimony of the seven police officers who gave evidence, out of the presence of the jury, to establish that the incriminating statements were free and voluntary.
 

 It is asserted by appointed counsel that these statements were inadmissible because appellant was pressured into giving them by reason of the untenable position into which he had been entrapped by the police due to their alleged illegal procedures. It is contended that, from the time the first officer arrived at the scene of the crime, appellant was under suspicion and the subject of direct investigations as the guilty party, and that all of the procedural safeguards established by the Supreme Court of the United States in the Miranda case were not followed by the officers at the time the investigation was focused on appellant as the guilty party.
 

 We find no merit in the bill. In his per curiam, the judge remarked: “Tarrance received so many warnings from so many police officers that it was ludicrous.” While there is evidence which supports the judge’s observation, we do not think it is the number of warnings that controls but rather the time they are given by the investigating officers. In other words, it was required that appellant be advised of his constitutional rights at the time the investigation of Mrs. Millien’s death ceased to be exploratory in nature, i. e., when the officers focused their attention on appellant as the guilty party in a homicide and sought to secure inculpatory statements from him. For the protective procedures erected in the Miranda case, as we understand it, make it obligatory for the officers to inform an accused of his privilege to remain silent and of his right to counsel when the individual is first subjected to interrogation while in custody at the police station, “ * * * or otherwise deprived of his freedom of action in any significant way.” See Miranda v. State of Arizona, 86 S.Ct. at page 1612, 16 L.Ed.2d at page 725.
 

 In the instant case, we find that the critical time occurred soon after the coroner arrived at the scene and discovered that the deceased had been shot in the back, thus eliminating any possibility of suicide. And it was at this time, according to the testimony of Detective Aymon
 
 *409
 
 (which is corroborated by certain other police officers), that appellant was given specific warnings or information required by the Miranda decision. In fact, there is evidence to support a holding that warnings were given appellant prior to this but, in our view, such pre-custodial precautions were not essential at the time they were given as the investigation had not reached the stage at which appellant, although unquestionably a suspect as the only individual present when the shooting occurred, became the perpetrator of a homicide in the eyes of the investigating officers.
 

 Bill of Exceptions No. 3 was reserved when the judge overruled defense counsel’s objection to the State’s introduction in evidence as Exhibits 21 and 22 of the photograph of the deceased, to which we have above referred, containing the inscription on the back, “We was playing”, and also a sample of appellant’s handwriting containing the same inscription which he voluntarily gave at the request of Detective Aymon, just prior to his admission that the inscription on the reverse side of the picture had been written by him. Detective Aymon identified the handwriting as that of appellant and stated that, although appellant had first told him that the inscription was written by the deceased, he later admitted that he had written it. The objection to the admission of the picture containing the inscription on the back and the sample of handwriting was that, at the time appellant admitted writing it, he was not fully advised of all his rights under the Miranda decision.
 

 In this Court appointed counsel for appellant advance substantially the same argument concerning the application of the Miranda decision as made under Bill No. 2.
 

 We think the bill insubstantial In the first place, the handwriting sample given by appellant and his admission that he had written the inscription on the reverse side of the picture occurred soon after Detective Aymon arrived at the scene and before the investigation focused on appellant as the guilty party. He was neither in custody nor had he been deprived of his freedom of action in any significant way at that time.
 

 Moreover, it is immaterial whether the handwriting sample was given before or after appellant was informed of his constitutional rights. There are two reasons for this conclusion. First, it was given voluntarily, and second, the privilege against self-incrimination, which is a bar against compelling “communications” or “testimony”, does not extend to compulsions of “real or physical evidence” which is used against one charged with crime. This view has been recently expressed by the Supreme Court of the United States in Schmerber v. State of California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908, in which it was held that a compulsory blood
 
 *411
 
 test was admissible and involved no testimonial compulsion.
 
 [2]
 
 See also Gilbert v. State of California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178, where the Court held, inter alia, that certain handwriting exemplars were not obtained in violation of the accused’s privilege against self-incrimination or his right to counsel. Cf. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149.
 

 Bill No. 4 was reserved when the judge refused to supply defense counsel with a copy of the written charge he had prepared in advance of argument. The refusal of counsel’s request was based on Article 801 C.Cr.P., which provides that a copy of the written charge be delivered to counsel “prior to reading it to the jury.”
 

 Appointed counsel concede that Article 801 C.Cr.P. does not require that a copy of the judge’s charge be delivered to counsel until before it is read to the jury, but they urge this court to apply the federal rule, which requires that the attorneys for either side be furnished copies of the charge or at last advised in specific detail of its contents in advance of argument.
 

 Suffice it to say that the proposition is not tenable. We are without authority to extend the provisions of our own law so as to fit it within the federal procedural system.
 

 Bill of Exceptions No. 5 was taken to the ruling of the trial judge in refusing defense counsel’s request that the jurors be informed that they might hear the recorded statements of appellant played again if they so desired.
 

 In view of the fact that the jury had already listened to the recordings and had also examined typewritten transcripts thereof and the circumstance that none of the jurors requested that the recordings be replayed at any time, we cannot perceive that the judge abused his discretion in denying counsel’s request.
 

 The judge committed no legal error in refusing the request. Article 793 C.Cr.P. provides:
 

 
 *413
 
 “A juror must rely upon his memory in reaching a verdict. He shall not he permitted to refer to notes or to have access to any written evidence. Testimony shall not be repeated to the jury. Upon the request of a juror and in the discretion of the court, the jury may take with it or have sent to it any object or document received in evidence when a physical examination thereof is required to enable the jury to arrive at a verdict.”
 

 None of the jurors requested that the recordings be replayed, and the judge made available all exhibits and the transcripts of the recorded statements. Hence, under these circumstances, there appears no basis for the bill.
 

 The conviction and sentence are affirmed.
 

 [1]
 

 . At the time of his trial appellant was represented by counsel of his own choice, who had been employed to defend him and who had taken this appeal on his behalf on March
 
 13,
 
 1967. During the pendency of the appeal, but before the transcript was lodged in this Court, the then counsel for relator filed an application for remedial writs of certiorari and mandamus under 250 La. 491, 196 So. 2d 804, in which it was alleged that appellant was an indigent person and, therefore, entitled to a free transcript of all the evidence. This application was denied, but we granted an order extending the time for counsel to perfect the hills for a period of thirty days or to May 8, 1967. Counsel then filed a petition in the Supreme Court of the United States for a writ of certiorari to review the order of this Court refusing the relief sought. The Supreme Court refused to stay order and subsequently, on November 6, 1967, 389 U.S. 941, 88 S.Ct. 299, 19 L.Ed.2d 293, denied counsel’s application. Meanwhile, on May 8, 1967 the then counsel for appellant filed an ex parte motion and secured an order from this Court to withdraw as counsel on the appeal. On May 15, 1967 the transcript of appeal was filed in this Court under Docket No. 48,728. On September IS, 1967 the State filed a motion in this proceeding praying that we either recall our order of May 8, 1967, permitting the former counsel for appellant to withdraw as his attorney, or appoint some other attorney to represent him on the appeal. On October 10, 1967, conformably with this request, we appointed Messrs. John R. Pleasant of Shreveport and George M. Leppert of New Orleans, prominent attorneys of the Louisiana Bar, to represent appellant on his appeal, and said attorneys were granted additional delays within which to prepare and perfect all bills of exceptions reserved on appellant’s behalf during the proceedings in the trial
 
 *401
 
 court. In accordance -with this appointment, counsel have perfected the bills of exceptions, filed a comprehensive brief, orally argued the matter contradictorily with the State, and the case has been submitted for our decision.
 

 [2]
 

 . In the Schmerber case the Court stated: (86 S.Ct. 1832, 16 L.Ed.2d 916)
 

 “It is clear that the protection of the privilege reaches an accused’s communications, -whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one’s papers. Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed.' 746. On the other hand, both federal' and state court's . have usually held that it offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling ‘communications’ or ‘testimony’, but that compulsion which makes a suspect or accused the source of ‘real or physical evidence’ does not violate it.”