JENKINS, J.,
Dissents with reasons.
hi respectfully dissent.
This Court exists for the purpose of correcting trial error. Where an error is present, preserved, and prejudicial, we must reverse. I believe that all three of these antecedent conditions are present here. As such, the majority errs in affirming the judgment of the trial court. Below I explain the majority’s two-fold error as well as why reversal and remand are required in this case.
Binika Hankton’s inculpatory statements to detectives regarding her role in Henry Barber’s stabbing were undoubtedly a major factor in her first degree murder conviction. Ms. Hankton’s recorded statement was played in full at least once. Portions of it were also played to impeach her trial testimony. Her inculpatory statements were also repeated by Detectives Gregory Hamilton and Desmond Pratt during their trial testimony. Jurors should never have heard this testimony nor seen Ms. Hankton’s recorded state *416 ment. Rather, Ms. Hankton’s inculpatory statements should have been suppressed under Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), because detectives failed to timely advise her of her constitutional rights per Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In addition, the trial testimony regarding | ?the timing of Miranda warnings administered to Ms. Hankton materially differs from the account adduced at the hearing on her motion to suppress, such that trial testimony shows Ms. Hankton’s incriminating statements were not elicited in a way that comports with the state and federal constitutions.
A trial court’s ruling on a motion to suppress will not be disturbed on appeal unless its conclusions are not supported by the evidence, or unless there exists a material internal inconsistency in the testimony of the witnesses or some otherwise palpable abuse of discretion. See State v. Phillips, 00-0279, p. 8 (La.App. 4 Cir. 10/4/00), 774 So.2d 989, 993, writ denied, 00-3048 (La.10/12/01), 799 So.2d 494. In reviewing a trial court’s suppression ruling, however, this Court is “not limited to evidence adduced at the hearing on the motion to suppress; it may also consider any pertinent evidence given at trial of the case.” Id. (citing State v. Nogess, 98-0670, p. 11 (La.App. 4 Cir. 3/3/99), 729 So.2d 132, 137). That is, in some cases, we should look beyond the suppression hearing to ensure that a defendant’s rights were respected.
On May 11, 2010, the trial court held a hearing on Ms. Hankton’s unsuccessful motion to suppress the incriminating statements she made to detectives on September 18, 2009. At the hearing, Det. Hamilton testified as to the circumstances under which Ms. Hankton’s incriminating statements were uttered. He recounted that when Ms. Hankton was first brought to the police station, she was not a suspect and was not Mirandized. Referring to their initial interview, Det. Hamilton explained that Ms. Hankton told detectives “some things that happened, how she was at [Mr. Barber’s] house[,] when she left,” observing that Ms. Hankton’s statement was “fine,” that she was “still not a suspect.” However, as |aDet. Hamilton explained, when he and Det. Pratt attempted to verify Ms. Hankton’s story “there were some inconsistencies in either what she was saying or what the people were saying.” At no time during the suppression hearing did Det. Hamilton discuss the nature of these inconsistencies. Nevertheless, he recalled that “[w]hen I went in to talk to her about those inconsistencies, it got to the point and she [said] ‘I’m going to tell you the truth.” ’ Det. Hamilton then testified that he Mirandized Ms. Hankton before she made any further statements:
Q: At that point, what happened?
A: At that point, knowing that, you know, it’s a culpable statement and her having knowledge of what occurred, I informed, at that point, I’ve got to inform you of your constitutional rights before you can tell me what — you know, the truth that you are about to tell me.?
Q: Now, you Mirandized at that particular time?
A: At that point, right.
Q: Now when you Mirandized at that time, was it by memory or by card?
A: I stopped her and I went out to get the formal document, which is what she had to sign and Mirandized her from that.
Det. Hamilton further explained that upon his return to the interview room, he went over the document with Ms. Hankton, at which point she voluntarily waived her rights and signed her name. Det. Hamilton noted that this waiver occurred around *417 2:00 a.m., between 11 and 12 hours after Ms. Hankton first arrived at the station.
To be clear, during the motion hearing Det. Hamilton claimed to have Mirandized, Ms. Hankton upon her uttering “I’m going to tell you the truth,” rather than some later statement. On cross-examination, Det. Hamilton reaffirmed this account.
Q: And during [the second] interview[,] you presented Ms. Hankton with some inconsistencies?
|4A: Right.
Q: So you had done some investigation that you hadn’t done before the first interview?
A: That is correct.
Q: And then when you confronted her with those inconsistencies, you claim that she immediately then said, “Now, I’m going to tell you the truth”?
A: That’s correct.
Q: And that is when you went outside, got a form ... and had her sign something?
A: Absolutely.
Q. And started the tape?
A: Right.
The trial court expressly relied on this testimony when it denied Ms. Hankton’s motion to suppress her statements, stating:
At the time of the second statement [Ms. Hankton] was still not a suspect; however, there were inconsistencies in what she said and when confronted with the inconsistencies, she stated “I’m going to tell you the truth.” At that point she was Mirandized.
I see no violation of any types of constitutional issues in regards to Mir-andizing her at the time that the police believed that she had gone from being a witness to a suspect.
Had this remained Det. Hamilton’s testimony throughout the proceedings, I might not now be dissenting. However, at trial, Det. Hamilton gave a markedly different account of the events culminating in Ms. Hankton’s inculpatory statements. While Det. Hamilton’s testimony regarding Ms. Hankton’s first interview and the events leading up to it was generally the same, his account of Ms. Hankton’s second interview materially departed from his previous suppression hearing testimony. For example, at trial, Det. Hamilton for the first time identified the inconsistencies with which he had confronted Ms. Hankton, including the details of her crack cocaine use with Sherman Gillum the night of September 15, |fi2009. The details of Det. Hamilton’s testimony also changed. Instead of recalling Ms. Hankton to have stated something like “I’m going to tell you the truth,” whereupon Ms. Hankton was immediately Mirandized, Det. Hamilton testified as follows:
\_Qi\nce she told me about she backed into him as he was shaving and he cut himself, at that point I advised her of her rights because this thing is not making sense, but before she could go further, in giving us any more information, I asked her, you know — I advised her of her constitutional rights before she could give us any more information.
This trial testimony[1] varies significantly from Det. Hamilton’s suppression hearing testimony, in which he claimed to have cut off Ms. Hankton immediately after her declaration that she was going to tell the truth. Det. Hamilton’s trial testimony is likewise inconsistent with the testimony of his colleague, Det. Pratt, who also took part in Ms. Hankton’s first and second interviews.
*418 Det. Pratt’s testimony was a hybrid of the two accounts Det. Hamilton had previously given. Specifically, Det. Pratt noted that following Ms. Hankton’s initial interview and statement, she was not a suspect. Despite this fact, Det. Pratt admitted that detectives interviewed Ms. Hankton’s uncle, Vincent Keller, Martha Horton, who was a manager at Mr. Barber’s apartment building, and Sherman Gillum, about the information that Ms. Hankton had furnished regarding her whereabouts and calls she had placed to them between September 15 and 17, 2009.
Inconsistent with Det. Hamilton’s testimony, Det. Pratt testified that Ms. Hank-ton’s second interview was prompted by “several inconsistencies” between what Ms. Hankton and her “uncle said, as far as truckwise, as far as times.” Per Det. Pratt, Ms. Hankton then divulged smoking crack cocaine after meeting up |fiwith Mr. Gillum. Det. Pratt recalled that detectives then “asked her a cowple more questions and at that point she stops us in our tracks, she said ‘That’s it. I’m going to tell you the truth.’ ” Det. Pratt continued testifying as follows:
So she states that she was backing a vacuum up in the hallway, right near the kitchen and Mr. Henry Mr. Barber had an object in his hand and he was— toward his neck area. She bumped into him and he stabbed himself in the neck area.
From there, blood dripped onto the floor and at the point me and Detective Hamilton quickly stopped the conversation. We then advised her of her Miranda rights at the point with the incul-patory statement [.]
Det. Pratt reaffirmed this order of events during cross-examination.
Thus, in contrast to Det. Hamilton’s suppression stage testimony, Det. Pratt testified that he and Det. Hamilton only stopped Ms. Hankton and Mirandized her following her statement that she backed into Mr. Barber, rather than immediately after declaring she would tell the truth but before inculpating herself. The detectives’ accounts are at odds. In fact, Det. Hamilton’s own suppression hearing and trial testimony is internally inconsistent.
Although the majority is of the opinion that the discrepancies in the detectives’ testimonies are “of no consequence,”[2] I respectfully but wholeheartedly disagree. This Court has previously concluded that trial testimony reflecting a change in the essential outline of the case as it was presented at suppression hearing testimony warrants close examination. See, e.g., Phillips, 00-0279, p. 7, 774 So.2d at 993. Phillips involved an appeal from a drug conviction in which the arresting officer’s suppression testimony “differed substantially from his testimony at trial.” Id., 00-0279, p. 2, 774 So.2d at 990 (emphasis added). At the hearing, the officer testified that he witnessed the defendant toss a bag of cocaine to the |7ground, giving the officer reasonable suspicion to detain the defendant. Id., 00-0279, p. 2, 774 So.2d at 990. At trial, however, the testimony from the same officer was that the defendant did not drop the bag until after the officer had ordered the defendant to the patrol car, thereby calling into question whether reasonable suspicion existed for the initial stop. Id., 00-0279, pp. 2-3, 774 So.2d at 990-91, 993. Relying on the officer’s trial testimony, which “more fully presented” the issue, we concluded that the stop occurred before reasonable suspicion existed and, on that basis, reversed the conviction, holding the motion to suppress was wrong *419 ly denied. Id., 00-0279, p. 8, 774 So.2d at 993.
I believe that Phillips controls how the inconsistent testimony of Detectives Hamilton and Pratt should be treated and requires us to examine the trial court’s suppression ruling in light of the detectives’ trial testimony. See id., 00-0279, p. 8, 774 So.2d at 993. Their trial testimony clearly places Ms. Hankton’s Mirandization at a different, later point in time than was testified to during the suppression hearing. Not only does it manifest a shift in the essential outline of the case, more importantly, the detectives’ trial testimony indicates that Ms. Hankton’s inculpatory statements were illegally obtained.
Consistent with the federal constitution, our state constitution insists that individuals subjected to custodial interrogation must be properly Mirandized, i.e., fully advised of their rights.[3] Before the State may introduce a defendant’s inculpatory statement from such an interrogation at trial, it must first establish that the defendant was informed of his or her rights against self-incrimination and to |sthe presence of counsel at the interrogation. See State v. Blank, 04-0204, pp. 9-10 (La.4/11/07), 955 So.2d 90, 103; La. Const. art. I, § 13; Miranda, supra.
Whether a custodial interrogation exists depends upon “[t]wo discrete inquiries,” namely “what were the circumstances surrounding the interrogation” and “given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave.” J.D.B. v. N. Carolina, — U.S. -, 131 S.Ct. 2394, 2402, 180 L.Ed.2d 310 (2011); accord. State v. Ned, 326 So.2d 477, 479 (La.1976). This inquiry looks at the totality of the circumstances surrounding the investigation, “including any circumstance that ‘would have affected how a reasonable person’ in the suspect’s position ‘would perceive his or her freedom to leave,’ ” but ignoring the “subjective views harbored by either the interrogating officers or the person being questioned.” Id. at 2402 (quoting Stansbury v. California, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994)) (internal citations omitted); accord State v. Saltzman, 03-1423, pp. 1-2 (La.4/8/04), 871 So.2d 1087, 1088.
Sometimes police interviews evolve into custodial interrogations for which Miranda warnings are required. How investigators respond to changing circumstances can make the difference in whether an inculpatory statement is admissible. For example, in State v. Ned, our Supreme Court reviewed the simple arson conviction of a defendant who claimed that inculpatory statements introduced against him at trial were obtained absent the requisite compliance with Miranda. Id., 326 So.2d 477, 478 (La.1976). The defendant was taken to the sheriffs office by his mother, who had overheard the defendant’s brother implicate him in the arson of a local high school. Id. at 478. The defendant’s appearance at 19the station came as a surprise to the officers, who had not requested his presence but nevertheless arranged to interview him in connection with the arson allegation. Id. at 478. A juvenile officer intermittently spoke with the defendant over the course of an hour and a half before the officer began to suspect the arson allegations had merit. Id. at 479. At that point, the defendant was Mirandized and his statement was taken. Id. at 480. Observing that Miranda warnings are only necessary after an investigation has ceased to be exploratory in nature, the Court held that the “facts of this case amply support a conclusion that defendant was informed *420 of his rights before or at the time the interrogation became custodial.” Id. at 479 (citing State v. Tarrance, 252 La. 396, 211 So.2d 304, 309 (1968)). Despite this result, the Court cautioned that “Custodial interrogation is an awesome experience” and that “it would defeat the purposes of the Miranda warnings to allow law enforcement officials to wait until a suspect has suffered the effects of psychological coercion before informing him that he is not obligated to incriminate himself[J” Id. at 480. For this reason, Louisiana’s courts do not “condone unwarranted delays in informing suspected persons of their constitutional rights.” Id.
Several years later, the Louisiana Supreme Court squarely addressed the issue of delayed Miranda warnings in State v. Menne, 380 So.2d 14 (La.1980). Menne concerned an appeal from a second-degree murder conviction based, in part, on the defendant’s unsuppressed inculpatory statements. Id. at 15. Those statements arose out of questioning initiated when the defendant voluntarily submitted to detectives’ request for a station house interview pertaining to a murder investigation. Id. The defendant’s interview consisted of questioning in an |ininterrogation room by two detectives who never informed him that there was no legal obligation to answer them or remain at the station. Id. After an hour, detectives told the defendant that he was the last person with the murder weapon before the victim’s death. Id. at 16. The defendant then confessed to the murder, after which he was Miran-dized for the first time and supplied a second, recorded confession to detectives. Id. Reviewing these facts, the Supreme Court concluded that the defendant was subject to a custodial interrogation at least from the time the detectives questioned his credibility and placed him as that last person with the murder weapon, thereby indicating that the investigation had focused on him. Id. at 17, 19. “Under these circumstances,” the Court reasoned, “warnings were required and the prosecution should not have been permitted to use the statements obtained from the defendant without procedural safeguards effective to secure his privilege against self-incrimination.” Id. at 19. Reversing the defendant’s conviction, the Court granted the defendant’s motion to suppress both his pre- and post -Miranda statements for purposes of further trial proceedings. Id.
In important ways, Menne anticipates Missouri v. Seibert, the United States Supreme Court case on which Ms. Hankton bases her claim that her inculpatory statements should have been suppressed. Sei-bert addressed the constitutional infirmity of the midstream recitation of Miranda warnings. See Seibert, 542 U.S. at 604, 124 S.Ct. 2601. In that case, the defendant was arrested early in the morning on suspicion of murder and transported to the police station where she was subjected to an unwarned interrogation lasting 30 to 40 minutes. Id. at 604-05, 616, 124 S.Ct. 2601. The questioning was systematic, exhaustive, and successfully employed to have a pronounced psychological effect on the defendant. Id. at 605, 616, 124 S.Ct. 2601. The defendant |nconfessed, after which she was given a brief break, followed by the same detective Mirandizing her and again eliciting her confession in the same location as the original confession. Id. at 605, 124 S.Ct. 2601. A plurality of the Supreme Court reasoned that after the initial confession, detectives did nothing to counter the probable misim-pression that “the further questioning was a mere continuation of the earlier questions .... in which it would have been unnatural to refuse to repeat” her inculpato-ry statements. Id. at 616, 124 S.Ct. 2601. For example, detectives did not warn the *421 defendant that her first statement could not be used against her. Id. The absence of such a warning, the Court opined, “blunts the efficacy of [later] warnings and points to a continuing, not a new, interrogation.” Id. at 616 n. 7, 124 S.Ct. 2601. Holding that midstream warnings given only after unwarned confessions do not comply with Miranda and threaten to thwart constitutional safeguards against coerced confessions, the Court ordered both the defendant’s pre- and post-warning confessions suppressed. Id. at 617, 124 S.Ct. 2601.
Applying Ned, Menne, and Seibert to the instant case, Ms. Hankton’s statements (both recorded and otherwise) should have been suppressed as the products of an improperly conducted custodial interrogation. As in Menne, Detectives Pratt and Hamilton requested to interview Ms. Hankton at their station, instead of by phone or at her home. Interrogations occurring in police-dominated environments, like a station house, generally favor the conclusion that a custodial interrogation took place. See, e.g., Miranda, 384 U.S. at 445, 86 S.Ct. 1602. Ms. Hankton was transported to the station in the back of a marked patrol vehicle despite Det. Hamilton arriving at Ms. Hankton’s home in an unmarked car and following her to the station. While it may be preferable to conduct interviews at a police station, | iawhere they can be recorded, neither of Ms. Hankton’s first two statements were recorded. Cf. Blank, 04-0204, pp. 15-16, 955 So.2d at 106-07 (after the defendant was transferred to the station by squad car, all 12 hours of his interview were videotaped and later transcribed for review; the defendant was Mirandized at the outset and several subsequent times).
There is no dispute that Ms. Hankton arrived at the station around 3:00 in the afternoon. Much like the defendant in Menne, Ms. Hankton was then interviewed by two detectives exclusively about her relationship with the victim, Mr. Barber. The record does not state how long her initial interview lasted, but it was some three hours before Ms. Hankton’s aunt and uncle showed up to take her children home.[4] Once Ms. Hankton’s family members left without her, Ms. Hankton was indisputably isolated at the station. See State v. Johnson, 393 So.2d 1255, 1259 (La.1981) (the absence of others not party to the investigation and isolation in a hostile atmosphere both weigh in favor of a custodial interrogation); see also United States v. Cavazos, 668 F.3d 190, 194 (5th Cir.2012) (holding separation from one’s family members to favor finding a custodial detention). Additionally, when detectives asked Ms. Hankton to conduct a second interview some 10 to 11 hours after she initially arrived at the station, there is reason to believe a more hostile interview was in the offing.
During their second interview with Ms. Hankton, Detectives Pratt and Hamilton confronted her with inconsistencies they had turned up when attempting to verify her earlier statements. Similar to Menne, the detectives’ line of | ^questioning would have given Ms. Hankton the impression that, at minimum, they were going over the details of her story with a fine-toothed comb. By this time, Ms. Hankton would have known that detectives had spoken with her uncle about the precise timing of *422 her truck usage and spoken with Sherman Gillum, not just to verify her whereabouts, but to ascertain the details of her time with Mr. Gillum. It is unlikely that a reasonable person, confronted with questions about these inconsistencies would feel free to leave. This is especially true if, as Det. Hamilton testified at trial, Ms. Hank-ton was confronted with the allegation that she had purchased and used crack cocaine on September 15, 2009, in violation of her probation. Thus, according to Det. Hamilton, during their second interview with Ms. Hankton, detectives were asking questions likely to elicit inculpatory responses, much like in the critical stages of the Menne and Seibert interrogations. Indeed, this mode of questioning was successful: Ms. Hank-ton admitted to smoking crack cocaine when confronted.
By the time Ms. Hankton’s crack use came up, the character of the investigation had clearly shifted from exploratory questioning to an investigation keenly focused on Ms. Hankton, the holes in her story, and incriminating details about her activities on the evening of September 15, 2009. It would have been appropriate to Miran-dize Ms. Hankton at this point insofar as detectives clearly thought they had enough to arrest her for a probation violation.[5] See Ned, 326 So.2d at 480 (noting that Louisiana courts do not condone unwarranted delays in apprising suspects of their Miranda rights). Crucially, all testimony indicates that Ms. Hankton’s incriminating statements regarding Mr. Barber’s stabbing were 114made only after Ms. Hankton had confessed to the offense for which she was first arrested — -violating the terms of her probation by using drugs. Given the sequence of events, I am compelled to conclude that a custodial interrogation had begun when detectives began to probe the inconsistencies in Ms. Hankton’s account and certainly no later than when Ms. Hankton admitted to using cocaine in violation of her probation. Therefore, the detectives’ Miranda warnings came too late.
Though the detectives’ trial testimony differs in some respects, their accounts converge on one key detail: Ms. Hankton was Mirandized only after she first mentioned Mr. Barber’s stabbing. After she was Mirandized, the detectives then quickly led her to make the same inculpa-tory statements a second time, but this time on the record. This mirrors the midstream warning technique that the Seibert Court held to be incompatible with Miranda. See Seibert, 542 U.S. at 617, 124 S.Ct. 2601; cf. Menne, 380 So.2d at 19. While, unlike in Seibert and Menne, there was not perfect continuity between the officers present at Ms. Hankton’s second and third interviews — Det. Pratt was replaced by Det. McCleery when Ms. Hankton’s post-Miranda statement was recorded — no other material change in circumstances appears on the record. Besides the partial change in personnel, nothing about the circumstances of Ms. Hankton’s third interview would suggest to her that the prior interrogation had ceased or that she could now meaningfully refuse to further inculpate herself by making the statement again. Instead, as in Seibert and Menne, the detectives here appear to have taken no affirmative steps to suggest to Ms. Hankton that their Miranda warnings marked a critical threshold, distinguishing it from her second statement. The detectives did nothing to *423 lessen the risk of a coerced confession or other incriminating statement. In fact, the speed with which 11Bthe officers moved — Ms. Hankton’s second statement was taken sometime after midnight and she completed her third statement before 1:30 a.m. — ran the risk of making their Miranda warnings appear to be mere formalities.[6] See Seibert, 542 U.S. at 616, 124 S.Ct. 2601 (stating that a pause of only 15 to 20 minutes between unwarned and warned phases of interrogation was insufficient to correct the misimpression that further questioning was a mere continuation of a prior interrogation).
In this case, the testimony about the point at which Ms. Hankton was Miran-dized — a crucial ingredient to the trial court’s ruling on Ms. Hankton’s motion to suppress — shifted over time. Detectives’ trial testimony is inconsistent with the suppression hearing testimony on which the trial court’s ruling was based. The trial testimony placed detectives’ warnings to Ms. Hankton later in time than both the inception of a custodial interrogation and the utterance of Ms. Hankton’s initial in-culpatory statement. Therefore, the procedural safeguards designed to guard against compelled self-incrimination were lacking during Ms. Hankton’s interrogation. As a result, Ms. Hankton’s statements should be suppressed.
In determining that Ms. Hankton’s statements should be suppressed, I would also reverse her conviction and sentence on the grounds that the issue cannot be resolved on harmless error. As our high court recently reaffirmed, “the burden of proving harmless error rests squarely on the shoulders of the party benefiting from the error.” State v. Lewis, 12-1021, pp. 15-16 (La.3/19/2013), 112 So.3d 796, 805 (citing Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)) (holding that the State had failed to meet its burden of proving the trial |1ficourt’s refusal to grant the defendant a preempto-ry challenge constituted harmless error) (emphasis added); accord. State v. Hamdalla, 12-1413, p. 11 (La.App. 4 Cir. 10/2/13), 126 So.3d 619, 625 fn. 2 (“The prosecution bears the burden of proving harmless error as they were the beneficiary of the error”) (citation omitted); State v. Marshall, 12-0650, p. 8 (La.App. 4 Cir. 7/31/13), 120 So.3d 922, 928 (holding that when a constitutional error involves the “illega[l] admifesion] of highly prejudicial evidence or comments,” the State bears the burden of establishing that the error is harmless beyond a reasonable doubt) (citation omitted).
In the case at bar, the State never attempted to argue that the erroneous admission of Ms. Hankton’s statements constituted harmless error. The State’s brief does not even mention harmless error in relation to the Miranda violations alleged by Ms. Hankton. Absent such an argument, the State failed to meet its burden under Lewis. See Lewis, 12-1021, pp. 15-16, 112 So.3d at 805; Hamdalla, 12-1413, p. 11, 126 So.3d 619, 625 fn. 2; Marshall, 12-0650, p. 8, 120 So.3d at 928. Therefore, reversal is compelled under the law and facts of this case.
In concluding, I believe that it is necessary to address the majority’s position that the detectives were under no obligation to give Ms. Hankton Miranda warnings because her statement was neither inculpato- *424 ry nor exculpatory.[7] I |17disagree for the reasons already stated, but more importantly because this position is not supported by the law. The primary purpose for requiring Miranda warnings is to protect defendants from disclosing incriminating information. In fact, in Miranda itself, the Supreme Court stated:
The warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant. No distinction can be drawn between statements which are direct confessions and statements which amount to ‘admissions’ of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination.
Miranda, 384 U.S. at 476, 86 S.Ct. at 1629 (emphasis added).
The Court explained that “for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely ‘exculpatory.’” Id., 384 U.S. at 477, 86 S.Ct. at 1629. It did not, however, limit inadmissible statements to merely those labeled as, or used as “inculpatory” or “exculpatory” statements. Rather, the Court recognized that “[i]f a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution.” Id. The Court further noted that “statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication.” Id. Clearly, in requiring officers to warn suspects of their constitutional rights, the Court anticipated a situation such as the one herein where officers elicit and the State introduces conflicting statements by a defendant for impeachment purposes.
I also disagree with the majority’s assertion that Ms. Hankton’s statement “neither implicated her in nor exculpated her from Mr. Barber’s murder, but rather 11S“simply placed Ms. Hankton at Mr. Barber’s apartment.” A statement placing a suspect at a crime scene is, by its very nature, inculpatory to some degree because it shows that the individual had the opportunity to commit the crime. See, e.g., State v. Hailes, 501 So.2d 788, 789 (La.App. 4 Cir.1986) (wherein the Court reasoned that a statement “although ... not a confession, ... is inculpatory in that it placed defendant at the scene, therefore the danger of prejudice is present”). In addition, Ms. Hankton’s statement was also inculpatory because her divulged *425 crack usage helped establish a possible motive.
The defendant deserves a new trial free of the errors identified above. Because Ms. Hankton’s inculpatory statements were obtained in violation of Miranda, it was error for the trial court to admit them into evidence. The majority errs in failing to seize upon the well-documented Miranda violation in this case. For the forgoing reasons, I dissent from the judgment and would reverse.

. On redirect examination, Det. Hamilton reaffirmed this second version of events.

. See fn. 12 of majority opinion.

. See generally La. Const. art. I, § 13; Miranda, 86 S.Ct. 1602.

. At this point, she had already been at the station for questioning considerably longer than the interrogations lasted in Ned, Menne, and Seibert. See Ned, 326 So.2d at 479; Menne, 380 So.2d at 16; Seibert, 542 U.S. at 604-05, 616, 124 S.Ct. 2601; see also United States v. Cavazos, 668 F.3d 190, 194 n. 1 (5th Cir. 2012) ("A detention of approximately an hour raises considerable suspicion that an individual has been subjected to a custodial interrogation”) (internal quotation omitted).

. The record confirms that Ms. Hankton was arrested for violating of her parole, but only after giving her recorded statement to detectives. Detectives, therefore, must have felt they had probable cause to arrest Ms. Hank-ton as soon as she admitted her crack use to them.

. I do not comment on Ms. Hankton’s troubling testimony that Det. Hamilton promised her she could go home after signing a Miranda waiver, save to note that such a presentation of the waiver would at the very least trivialize the warning procedure in the eyes of a suspect and sap Miranda warnings of all significance.

. In addition, to the extent that the majority seems to suggest that Ms. Hankton was not a suspect in Mr. Barber's murder when she gave her second statement because his autopsy was not complete and because his death had not been classified a homicide, this position is unfounded. As Mr. Barber was stabbed twenty-one times, it is hard to imagine that seasoned detectives would not suspect that a homicide had occurred after viewing his body. In fact, evidence revealed that Det. Pratt was assigned as the lead homicide detective on the case, viewed the stab wounds to Mr. Barber’s body at the scene, and interviewed Ms. Hankton as part his investigation. Moreover, although Det. Hamilton’s testified that he was unaware of the nature of Mr. Barber’s injuries or the circumstances of his death when he interviewed Ms. Hankton, the information known by Det. Pratt was arguably imputed to him as part of the investigating team. See e.g., State v. Rodrigue, 437 So.2d 830, fn. 5 (La.1983) ("facts known to officers who are engaged in a common enterprise of investigating a known offense should be imputed to all members of the ‘investigating team’ ”) (internal citations omitted).